IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| LAZY J RANCHES LIMITED PARTNERSHIP,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA and UNITED STATES FOREST SERVICE,<br><br>　　　　　　　Defendants. | CV 23–67–BU–DLC<br><br><br>ORDER |

Before the Court are Plaintiff Lazy J Ranches Limited Partnership's ("Lazy J") motion for summary judgment (Doc. 29) and Defendants United States of America and United States Forest Service's (collectively, "USFS") motion for summary judgment (Doc. 32). The Parties dispute the scope of a 1979 easement ("the Easement") between USFS and Lazy J's predecessors in interest. The Court held a hearing on the motions (Doc. 44), and the motions are now ripe for ruling. For the reasons herein, Lazy J's motion for summary judgment is GRANTED and USFS's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

FACTUAL BACKGROUND[1] [2]

## I.    Stone Creek Road

National Forest System Road ("NFS Road") No. 480, known as Stone Creek Road, (also referred to herein as "the Road") is located approximately 14 miles northeast of Bozeman in Gallatin County, Montana. Stone Creek Road commences at its intersection with Bridger Canyon Road and proceeds east, up the Stone Creek drainage. Stone Creek Road is recognized as a NFS road and is open to highway-legal vehicles for year-round access, as evidenced by its designation on the Custer Gallatin National Forest Bridgers/Bangtails Motor Vehicle Use Map ("MVUM").

From its starting point and for approximately 1.2 miles, Stone Creek Road passes through private real property now owned by Lazy J. A parking area and trailhead are located at the end of this 1.2 mile segment. The trailhead provides

---

[1] Lazy J failed to file a Statement of Disputed Facts in response to USFS's Statement of Undisputed Facts (Doc. 34). Under this District's Local Rules, that omission is deemed an admission that no material facts are in dispute. *See* D. Mont. L.R. 56.1(d). This section, therefore, consists of USFS's statement of undisputed facts (Doc. 34), and other facts that the Court deems substantially undisputed.

[2] USFS includes several undisputed facts about Lazy J's co-owner D.J. Brask, including but not limited to: Mr. Brask formerly lived in Texas but moved to Bozeman in September 2024; Mr. Brask "had no involvement with the acquisition of the property other than 'financial involvement'"; and despite Mr. Brask's responsibility for doing "doing due diligence in advance of purchasing the property" he "did not view or examine the Easement at issue in this case." (Doc. 34 ¶¶ 71–74.) The Court finds these facts to be immaterial to the legal issue at hand.

access to Bangtail Divide Trail and National Forest Service ("NFS") lands in the Bangtail Mountains. Stone Creek Road continues east, past the trailhead and parking area, to privately owned lands. The 1.2 mile segment of Stone Creek Road between Bridger Canyon Road and the trailhead is the segment of the road at issue in this case.

### A. Establishment of the Road

Historically, a checkerboard pattern of ownership existed within the National Forest boundary, with alternating sections of land owned by the Northern Pacific Railway Company and the United States. The patchwork of public and private lands in the Stone Creek drainage has meant that easements have been necessary to secure road access in the drainage.

In 1973, with the re-routing of Bridger Canyon Road, Burlington Northern acquired a new right-of-way easement from landowners James and Beatrice Taylor (Lazy J's predecessor in interest) ("Burlington Northern Easement"). The Burlington Northern Easement provided Burlington Northern non-exclusive access through the Taylors' property and gave Burlington Northern the right to grant the United States use of the easement to "construct, maintain and use a road over and across" the lands. The roadway contemplated in the Burlington Northern Easement was in a different location than the historic, unimproved Stone Creek Road.

At the same time, other private landowners in the area—G. Peter Koss,

along with Raymond and Betty Tocci—sought to develop a forty-acre guest ranch, complete with ten cabins and lodge facilities along Stone Creek. The Bridger Canyon Planning and Zoning Commission approved the project, subject to the construction of adequate road access between Bridger Canyon Road and the development.

In an agreement executed on November 15, 1977, the Taylors granted Koss and Raymond Tocci a non-exclusive right of way over their property in the same location as the 1973 easement granted to Burlington Northern (i.e., in the S½SW¼ and the SW¼SE¼ of Section 9) (the "Koss-Tocci Easement"). The location of the Koss-Tocci Easement and the Burlington Northern easement intersected Bridger Canyon Road in a different location than where Stone Creek Road and the Easement at issue in this case currently intersect Bridger Canyon Road. Beyond the segment of the road near the intersection, the Koss-Tocci and Burlington Northern Easements generally followed the Easement.

The Koss-Tocci Easement provided, "[i]t is further covenanted between the parties that the roadway is a private roadway easement and is not to be construed as a public roadway, but it shall run with the lands owned by Second Parties [i.e., Koss and Tocci] as a nonexclusive easement. In the event that use of said roadway shall be abandoned by act of Second Parties or nonuse for a period of five (5) years by Second Parties, or their assignees, then this easement shall be void and all title

4

to lands revert to Taylor or assigns."

As part of the Koss-Tocci Easement, Koss and Tocci agreed to construct a locked gate at the intersection of the roadway and Bridger Canyon Road, rather than the cattle guard that Burlington Northern had agreed to construct. The Koss-Tocci Easement provided that "instead of having construction of a cattle guard that there be established a gate at the commencement of the easement, both parties to maintain their own locks on the gate, said gate to be of the type of construction as determined by Taylor . . . ." There is no evidence that either Burlington Northern or Koss and Tocci undertook any efforts to construct the road contemplated by their easements. Nor is there any evidence that any party further pursued construction of a roadway gate on any portion of the Taylors' property or in any easement granted by the Taylors.

USFS became concerned with the Taylors' easements granted to Burlington Northern and Koss and Tocci. Given the non-exclusive nature of Burlington Northern's easement, it could not grant USFS the required road use controls. Further, Taylor could grant others the right to use a road to be cost shared and the Government could not expect to recover its excess investment costs. Given these concerns, USFS sought to acquire a new easement from the Taylors.

In 1979, USFS acquired the right to construct and administer the segment of Stone Creek Road at issue in this case through the Easement. The grantors of the

Easement were James C. Taylor, Beatrice R. Taylor, Raymond P. Tocci, Betty J. Tocci, and G. Peter Koss (collectively, "Grantors").[3] USFS was the acquiring agency.

The Easement provides, in relevant part:

Grantors, for and in consideration of $1.00 received by Grantors, do hereby grant and convey unto the Grantee and its assigns, an easement for Stone Creek Road No. 480, variable in width with such additional width as is necessary to accommodate and protect cuts and fills, over and across the following described lands in the County of Gallatin, State of Montana:

T.1 S., R. 7.E., P.M.M.
sec. 9, Lots 5, 6, 7, 8 and S1/2SW1/4

The said easement is in conformity with and located upon the ground according to the survey line, figures, measurements, widths, and other references shown on the plat hereto attached and made a part hereof. If the road is located substantially as described herein, the centerline of said road as constructed is hereby deemed accepted by the Grantor as the true centerline of the easement granted.

Together with such reasonable rights of temporary use of the Grantors' lands immediately adjacent to said right-of-way as may be necessary for the construction, reconstruction, improvement, and maintenance of said road.

The acquiring agency is the Forest Service, Department of Agriculture.

This easement is granted on condition that the grantee shall not construct any fence within the specified right-of-way.

Grantee alone may extend rights and privileges for use of the road to other Government departments and agencies, States, and local

---

[3] Lazy J acquired the Taylors' property in Section 9 in 2014. The Taylors, therefore, are Lazy J's predecessor in interest.

subdivisions thereof, and to other users including members of the public.

(Doc. 31-1 at 1.) The Easement was granted subject to three rights reserved by the Grantors:

1. The right to cross and recross the easement at any point and for any purpose in such a manner as will not materially interfere with the use of the road.

2. The right to all timber now or hereafter growing on the easement subject to the Grantee's right to cut timber on the easement to the extent necessary for constructing, reconstructing, and maintaining the road. Timber so cut shall, unless otherwise agreed to, be cut into logs of standard lengths and decked along the road for disposal by the Grantors.

3. The right to use the road to be constructed or reconstructed to serve Grantor's property subject, however, to traffic control regulations as Grantee may reasonably impose and the bearing of road maintenance costs proportionate to use, in each case as authorized and provided by the regulations of the Secretary of Agriculture and as they may be amended and published in the Code of Federal Regulations.

(*Id.*)

The Easement document included a plat showing the general location and dimensions of the right-of-way. The Easement plat shows locations of various turnouts to be constructed, including three principal turnouts that remain in consistent use today.

Stone Creek Road was constructed in 1982 or 1983 with a gravel surface identified as 14 feet wide. The Easement itself is generally 60 feet in width, 30 feet from the centerline of the road on each side.

### B. Disputed Uses of the Easement

The public uses Stones Creek Road to access the Bangtail Mountains for a variety of recreational activities, including hiking, horseback riding, hunting, running, snowshoeing, and mountain biking. Lazy J does not dispute this use of the Road.

However, Lazy J has complained that members of the public park and camp off Stone Creek Road, but within the Easement. Lazy J has further complained that this use of the Easement has resulted in other problems, including but not limited to, use of Lazy J land outside of Stone Creek Road, dogs off lease chasing and disturbing cattle on Lazy J property, damage to existing fencing and signs belonging to Lazy J, littering, and parked vehicles prohibiting Lazy J from moving its cattle across Stone Creek Road. Lazy J further contends that, pursuant to the terms of the Koss-Tossi Easement, USFS must install a gate across Stone Creek Road where the Road joins Bridger Canyon Road.

### PROCEDURAL BACKGROUND

Following failed attempts to negotiate an informal resolution, Lazy J filed this lawsuit. Lazy J's Amended Complaint alleges two causes of action: quiet title—scope of easement, and overburden of servient estate. (Doc. 8.)

The Parties filed cross-motions for summary judgments. (Docs. 29, 32.) Lazy J argues that the Easement allows the public use of the surface of Stone

8

Creek Road, and only the surface, to access public lands. USFS contends that the Easement allows the public to use the Easement in its entirety for recreational purposes.

## LEGAL STANDARD[4]

The Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). With these principles in mind, the Court turns to the merits of the issues presented.

---

[4] With limited exceptions not applicable to this case, Federal Courts apply state law to property disputes such as the interpretation of an easement. *United States v. Park*, 536 F.3d 1058, 1061 (9th Cir. 2008). Accordingly, the Court applies federal procedural law and state substantive law in adjudicating the present motions.

DISCUSSION

## I.    Concessions

Following the filing of the present motions, both sides conceded their positions on certain issues.

First, at the hearing, Lazy J conceded that the public may park on the three turnouts on Stone Creek Road originally constructed by USFS. (*See also* Doc. 40 at 21.) Due to this concession, USFS abandoned its statute of limitations argument as moot. (Doc. 42 at 3.)

Second, the Court deems Lazy J's failure to file a statement of disputed facts as an admission that no material facts are in dispute as to USFS's motion for summary judgment. *See* D. Mont. L.R. 56.1(d). This means Lazy J has abandoned its argument regarding the placement of a gate on Stone Creek Road, and USFS is entitled to summary judgment on this issue.

## II.    Use of the Road

The remaining issue before the Court is relatively simple: the Parties seek judgment on the definition of the word "road."[5] Specifically, the Court must determine whether the phrase "use of the road," as its used in the Easement, is

---

[5] USFS argued in its opening brief in support of its motion for summary judgment that Lazy J's claims are barred by the Quiet Title Act's statute of limitations. (Doc. 33 at 12.) USFS abandoned that position as moot in its reply brief (Doc. 42 at 3), so the Court foregoes analysis of the argument.

confined to the surface area of the road itself, or whether the phrase includes the area immediately adjacent to the surface, including roadside turnouts.

Lazy J contends that the Easement does not allow USFS to authorize members of the public to utilize the Easement for any purpose other than normal roadway uses—specifically, passage over a described strip of land within the Easement. (Doc. 30 at 2.) According to Lazy J, USFS "should be obligated to implement and enforce controls to prevent [] unauthorized uses." (*Id.*)

Lazy J submits that while the Easement allows USFS to use the remainder of the Easement for "road purposes," such as roadway maintenance, construction of additional roadway, or re-construction of the present roadway, USFS cannot grant the public the right to use the servient estate outside of the defined Road. (*Id.* at 5–6.)

USFS contends that "use of the road" includes the entire right-of-way, Lazy J is not permitted to construct a gate across Stone Creek Road, Lazy J's complaints about dogs are beyond USFS's jurisdiction, and USFS does not permit camping along the road. (Doc. 33 at 18–23.)

"An easement is a nonpossessory interest in land—a right which one person has to use the land of another for a specific purpose or a servitude imposed as a burden upon the land." *Blazer v. Wall*, 183, 183 P.3d 84, 93 (Mont. 2008). "If an easement is created by a written instrument, it is considered an express easement."

*Woods v. Shannon*, 344 P.3d 413, 416 (Mont. 2015). The Parties agree that the

Easement at issue in this case is an express easement. (Docs. 30 at 6; 33 at 26.)

The interpretation of a written easement is governed by Montana's rules of

contract interpretation. *Paul Phillip Bardos and Mary L. Bardos, Revocable Trust*

*v. Spoklie*, 558 P.3d 1176, 1181 (Mont. 2024). "If the general grant or reservation

is vague or ambiguous, a court may resort to pertinent extrinsic evidence such as

the nature and character of the dominant and servient estates, the prior and

subsequent use of the properties, the character of the surrounding area, the nature

and character of any common plan of development for the area, and the

consideration, if any, paid for the easement." *O'Keefe v. Mustang Ranches HOA*,

446 P.3d 509, 520–21(Mont. 2019) (citing Restatement (Third) of Property

(Servitudes) § 4.1 cmt. D (2000)).

"However, if the originating conveyance expressed the intended purpose or

use of the easement in specific terms, as for ingress/egress, access, or roadway

purposes, the permissible scope of use must be determined from the specified

terms without resort to extrinsic evidence." *Id.*

Here, at oral argument, the Parties agreed that the Easement is unambiguous,

and thus, the Court should not consider extrinsic evidence.[6] As such, the Court

---

[6] Despite agreeing that the Court's analysis is limited to the Easement itself, the
Parties cite in briefing to the 1980 driveway approach application and USFS's
Manual and Forest Service Handbook to support their respective arguments. The

focuses its analysis on the language found within the four corners of the Easement and relevant statutory and case law.

### A. Text of the Easement

Lazy J highlights that "[n]o part of the Easement discusses recreational use of the Grantor's servient estate by <u>any party</u>." (Doc. 30 at 9.) According to Lazy J, "[n]othing in the Easement suggests that the public would or could do whatever it wanted on the Easement property outside of the existing road." (*Id.*) Lazy J then points to several specific provisions of the Easement which, in Lazy J's view, distinguish between the Road and the broader Easement.

USFS maintains that if the contracting parties meant to limit the public's "use," to ingress and egress, they would have included language limiting USFS's extension of "rights and privileges for use of the road," to the "right of passage." (Doc. 42 at 2.)

A thorough consideration of the Easement suggests that the word "road," as used within the Easement, is limited to the driving surface. The text of the Easement repeatedly distinguishes between the broader grant of an easement and the Road itself. The last sentence of the third paragraph of the first page of the Easement provides: "If the road is located substantially as described herein, the

---

Court finds analysis of these documents both unnecessary and beyond the allowed scope of review.

centerline of said road as constructed is hereby deemed accepted by the Grantor as the true centerline of the easement granted." (Doc. 31-1 at 1.) Later, the text explains that the conveyance is subject to three reservations by Grantors, including "[t]he right to cross and recross the easement at any point and for any purpose in such manner as will not materially interfere with the use of the road." *Id.* The third reservation provides an additional clue, stating that the Grantor reserves "[t]he right to use the road to be constructed or reconstructed to serve Grantor's property subject, however, to traffic control regulations as Grantee may reasonably impose and the bearing of road maintenance costs proportionate to use . . . ." *Id.*

The Court construes the contracting parties' reference to "the road to be constructed or reconstructed" as a distinction between the parts of Grantor's property that would become part of the Road, and the broader section of property encompassed by the Easement. While the Easement does not dictate the width of the roadway, the Easement does provide that once the Road was constructed, USFS would control and manage the Road, and could allow others to use the Road. However, the Easement itself does not include language which would suggest that USFS can permit public use of the broader Easement, off of the roadway surface.

"The language of contractual provisions should be interpreted according to its plain, ordinary meaning." *In re Deadman's Basin Water Users Ass'n*, 40 P.3d 387, 391 (Mont. 2002). The plain, ordinary meaning of the word "road" is the surface

area used for travel. Therefore, the USFS may confer upon the public the right to use the Road. But, activities that exceed the scope of the Easement—for example, camping and recreating with dogs off Road—constitute a burden on the servient estate.

### B. Montana Law

The Parties agree that the Court must restrict its analysis to the four corners of the Easement; however, the Parties also cite Montana law to support their respective positions regarding the scope of the Easement. Consideration of Montana law is indeed appropriate here, given the well-established principle that "[p]arties who make contracts are presumed to know the law, and that they make their contracts in direct reference to it." *Wilson v. Davis*, 1 Mont. 183, 195 (1870).

Lazy J cites to Montana Code Annotated Section 70-17-106—titled "Extent of servitude"— to support its interpretation of the scope of the Easement. Section 70-17-106 provides:

> (1) Except as otherwise provided in 23-2-312, 23-2-322, and this section, the extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired.

> (2) A servitude granted, either by the terms of the grant or by the nature of the enjoyment, to a local, state, or federal government body for administrative purposes does not create a right to use the servitude for any other purpose unless specifically provided for in writing in the grant.

> (3) The holder of a written servitude may not use the servitude to grant additional rights and privileges to a successor or assignee unless the successor or assignee is specifically provided for in writing in the grant.

While Lazy J concedes that subsections (2) and (3) were enacted after the Easement was executed, Lazy J insists that the subsections nonetheless "remain instructive by succinctly summing up Montana law that was in existence at the time of their adoption in 1979." (Doc. 41 at 5.) Specifically, Lazy J cites Section 28-3-305 which provides that "[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." In Lazy J's view, Section 28-3-305, which was in effect at the time the Easement was created, compliments today's Section 70-17-106(2), and bolsters its argument that USFS "has no right to create a greater servitude than that provided for in the Easement." (*Id.* at 5–6.)

The Court agrees with Lazy J in its concession regarding the enactment of Subsections (2) and (3). The statute does not state that it applies retroactively, and the Court declines to apply statutory restraints enacted in 2021 to an Easement executed in 1979. However, Section 28-3-205 bolsters the Court's conclusion in the previous section: the text of the Easement constricts the public's use of the road to the Road itself.

USFS argues that under Montana law, both now and as it existed at the time the contracting parties entered into the Easement, the word "road" includes the entire right-of-way, not just the driving surface. (Doc. 38 at 3.) USFS relies on Montana Code Annotated Section 60-1-103(17), which defines "highway" as

16

including "rights-of-way or other interests in land, embankments, retaining walls, culverts, sluices, drainage structures, bridges, railroad-highway crossings, tunnels, signs, guardrails, and protective structures." (*Id.*) According to USFS, because the Easement does not define the word "road," the term must be given its meaning under Montana law. (*Id.* at 4.) In response, Lazy J highlights Section 61-1-101(67) which defines "roadway" as "the portion of a highway that is improved, designed, or ordinarily used for vehicular travel, including the paved shoulder." (Doc. 40 at 19.) However persuasive the respective definitions of "highway" and "roadway" may be, both definitions are equally unhelpful to the dispute at hand, given that neither word is found in the Easement.

Next, USFS cites to *Public Lands Access Association v. Board of County Commissioners of Madison County*, 321 P.3d 38, 43 (Mont. 2014) ("*PLAA*"). (Docs. 33 at 24; 38 at 3.) In *PLAA*, the Montana Supreme Court considered whether a county road right-of-way established by prescriptive use is confined to the traveled portion of the road, or whether the public is able to access land adjacent to the road. The dispute in *PLAA* centered on the public's use of three county roads and surrounding areas in Madison County, Montana: Duncan District Road, Lewis Lane, and Seyler Lane. *Id.* at 40. All three roads cross the Ruby River by bridges which were constructed by, and are maintained by, Madison County. *Id.* Private individuals own the land adjacent to the public roads.

17

PLAA filed a complaint against Madison County alleging that the individuals owning land adjacent to the three bridges had constructed fences, thereby preventing the public from using the roads to access the Ruby River. *Id.* Following a bench trial, the district court held: (1) "the public has a prescriptive right to travel and to use Seyler Lane between the fences and likewise upon the Seyler Bridge"; (2) "Madison County has a prescriptive right independent and separate from public use to lateral and subjacent support for Seyler Lane and Seyler Bridge, together with such additional land as is reasonable and necessary for maintenance and repair"; and (3) "Except as described in paragraph 2 above, there is no public right whatsoever on either side of Seyler Lane outside the fences or beyond the traveled way where there is no fence." *Id.* In so holding, the court determined that the County had a "secondary easement," consisting of land adjacent to the land within the fences, which allowed the County to maintain and repair the public rights-of-way. This secondary easement, however, belonged only to the County, meaning that the public was prohibited from accessing the land on either side of the traveled rights-of-way.

On appeal, the Montana Supreme Court reversed the district court's decision as to the width of the public's prescriptive easement, holding "[i]n a public road right-of-way established by prescription, the areas necessary to support and maintain the road, as well as the land needed to make the road safe and convenient

for public use, are included in the public right-of-way." *Id.* at 42. The court

differentiated prescriptive easements from private easements, relying on the

holdings of several jurisdictions which all support "the general rule that the width

of a public prescriptive roadway extends beyond the traveled portion of the road to

include areas necessary for its support and maintenance." *Id.* at 43.

USFS insists that the holding in *PLAA* supports its position that under

Montana law, the public's permitted use of Stone Creek Road is not limited to the

traveled road, but rather, the public may use the entire Easement. (Doc. 42 at 5.)

On cursory review, the circumstances giving rise to the dispute in *PLAA* resemble

the issue currently before the Court. For example, both cases involve disputes

regarding the permitted use of public roads, and the areas abutting those roads. The

parties agree here, like they did in *PLAA*, that the public is permitted to use the

road itself, but disagree as to whether the public can use the adjacent land. Lazy J

argues here, like the County argued in PLAA, that the land adjacent to the traveled

road is accessible only by the applicable government agency to conduct

maintenance and repairs.

At risk of stating the obvious, *PLAA* considered the permitted use of a

prescriptive easement. Meanwhile, the Parties in the instant matter dispute the

permitted use of an express easement. Admittedly, at first blush, *PLAA* appears

easily applicable to the instant case. However, the Court finds that *PLAA* involved an entirely different legal question than the question currently in front of the Court. Ultimately, an application of *PLAA* to the instant case would require the Court to expand Montana law beyond its current bounds.

USFS also draws the Court's attention to the Montana Supreme Court's recent opinion in *Bardos v. Spoklie*, 558 P.3d 1176 (Mont. 2024). (Docs. 33 at 26 n 1; 38 at 12.) In *Bardos*, neighbors Bardos and Spoklie entered into an agreement that exchanged easements on their respective properties near Foy's Lake outside of Kalispell, Montana. *Id.* at 1178. Bardos's easement to Spoklie—the subject of the dispute between the parties in that case—allowed Spoklie to use Bardos's property from Daley Lane, a county road, northwest and south "[f]or roadway travel (ingress and egress) and for installation, maintenance and repair of underground utility services." *Id.* at 1179. Bardos further granted to Spoklie "an easement for the purpose of widening the corner where Deer Run and Soler Run intersect and to remove trees for the purpose of improving drivability around the corner. Upon completion of corner widening construction the new center line of the roadway as then built shall be the substituted 60 foot easement." *Id.*

Following the easement exchange, Spoklie began transporting construction equipment along the easement on Bardos's property for development on Spoklie's property. *Id.* at 1180. Due to the sharp and steep nature of the corner where Deer

Run intersects Soler Run, trucks were unable to navigate the corner and began

offloading construction vehicles on the side of Deer Run. *Id.* This resulted in

construction equipment parking along the edge of the easement for several days at

a time. *Id.* Bardos sued, and the district court ultimately granted Spoklie summary

judgment. The court found that the disputed activities were within the scope of the

easement because "the instances of Spoklie temporarily parking construction

vehicles off the side of the roadway but within the Spoklie Easement was for the

purpose of ingress and egress of the vehicles and incidental to the express rights of

ingress and egress." *Id.*

On appeal, the Montana Supreme Court affirmed the district court,

explaining that "[a]n express easement for the purpose of ingress and egress, with

no other restriction, entitles the holder of the easement and his or her 'family,

tenants, and invitees . . . to use the road 24 hours a day by any form of

transportation that does not inflict unreasonable damage or unreasonably interfere

with the enjoyment of the land crossed by the easement, also termed the servient

estate." *Id.* at 1182 (quoting *Woods v. Shannon*, 344 P.3d 413, 417 (Mont. 2015)).

USFS, relying on *Bardos*, argues that temporary parking alongside Stone

Creek Road is permissible because it is "necessary to both access adjacent Forest

lands and to utilize the Road itself." (Doc. 38 at 12.) The Court disagrees that the

*Bardos* holding is applicable to this case. As highlighted in Lazy J's reply, the

21

easement in *Bardos* granted Spoklie "an easement for the purpose of widening the corner where Deer Run and Soler Run intersect and to remove trees for the purpose of improving drivability around the corner." 558 P.3d at 1179. Spoklie then began parking construction vehicles within the area of the corner where Deer Run and Soler Run intersect. Here, in contrast, Lazy J does not object to the public parking vehicles in the areas that the public are permitted to use, pursuant to the express terms of the Easement. (*See* Doc. 41 at 12.) Similarly, Lazy J does not object to USFS parking construction vehicles off the road but within the Easement, in order to maintain the road. (*See id.*) The Court, therefore, declines to extend the *Bardos* holding to this matter.

Ultimately, the Court finds the relevant statutory law and caselaw unhelpful in interpreting the Easement, and therefore, relies on the text of the Easement alone.

## CONCLUSION

The scope of an express easement is determined by the terms of the deed. The express Easement at issue in this case allows USFS to extend the right to use Stone Creek Road to the public. The ordinary meaning of the word "road" limits the public's use to the road surface itself. Lazy J is therefore, as a matter of law, entitled to summary judgment on the meaning of the term "use of the road" as it is used in the Easement.

22

Accordingly, IT IS ORDERED that Lazy J's motion for summary judgment (Doc. 29) is GRANTED and USFS's motion for summary judgment (Doc. 32) is GRANTED IN PART and DENIED IN PART as follows:

1. Lazy J is entitled to summary judgment on the scope of the Easement insofar as the Easement dictates the allowed uses of Stone Creek Road. The Easement allows the public's use of the surface area of the road, including parking within the three turnouts shown in Government's exhibit E (Doc. 34-5 at 59–74); any public use beyond the surface area of the road is an unauthorized use of the Easement, and is therefore permanently enjoined; and

2. USFS is entitled to summary judgment insofar as Lazy J is not authorized to install a gate across Stone Creek Road.

IT IS FURTHER ORDERED that USFS shall post and maintain signs making clear to the public that public activities on the land within the Easement but off the road, including but not limited to driving off the road, parking, camping, and allowing dogs off leash are PROHIBITED.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment and close this case file.

Dated this 22nd day of January, 2026.

23

Dana L. Christensen, District Judge
United States District Court